FARRELL v. STATE.

Opinion delivered January 26, 1914.

1. CRIMINAL LAW—ARREST OF JUDGMENT—GROUNDS FOR.—The only grounds upon which a judgment shall be arrested is that the facts stated in the indictment do not constitute a public offense within the jurisdiction of the court. Kirby's Digest, § 2427. (Page 186.)

2. CRIMINAL LAW—STATUTORY OFFENSE—INDICTMENT.—An indictment charging the commission of a statutory offense may describe the offense in the general language of the statute, but the description must be accompanied by a statement of the particulars essential to constitute the crime charged, and must acquaint the accused with what he must meet upon the trial. (Page 186.)

3. CRIMINAL LAW—"FELONIOUSLY" DEFINED.—The word "feloniously" in an indictment signifies an intent to commit a crime. The word in its ordinary as well as legal acceptation, characterizes a mind bent on wrongdoing, and means that the act charged proceeded from an evil heart or purpose. (Page 187.)

4. CRIMINAL LAW—HOMICIDE—SUFFICIENCY OF INDICTMENT.—An indictment returned under Kirby's Digest, § 1768, and charging that defendant unlawfully, wilfully, feloniously, and of malice aforethought, and after deliberation and premeditation, deliberately assisted deceased in the commission of suicide by procuring for her the morphine which she used for that purpose, sufficiently charges that the defendant knew that the poison which he procured and delivered to deceased was to be used by her for the purpose of self-murder, and that it was given to her for that purpose. (Page 187.)

5. WITNESSES—BELIEF IN GOD—COMPETENCY.—A witness who has written a pamphlet showing his belief in a God, is competent to testify, under Const. 1874, art. 19, § 1, the pamphlet being proper evidence of his beliefs. (Page 187.)

6. EVIDENCE—WRITINGS OF DECEASED—RES GESTAE.—In a trial for homicide it is proper to introduce in evidence as part of the *res gestae* a note signed by the deceased, written before she had taken a fatal drug as having a tendency to elucidate and give character to the acts of the parties. (Page 188.)

7. EVIDENCE—SUICIDE—WRITING OF DECEASED—ADMISSIBILITY.—Where deceased committed suicide, a note written by her, explaining her acts, is admissible in a trial of defendant for homicide for giving her the poison with which to commit the act. (Page 188.)

8. EVIDENCE—INCOMPETENT TESTIMONY—UNDISPUTED FACT—PREJUDICE.—There is no prejudicial error in admitting incompetent testimony of a fact that has been proved by the undisputed evidence. (Page 188.)

9. CRIMINAL LAW—HOMICIDE—CONVICTION—SUFFICIENCY OF EVIDENCE.—Where deceased committed suicide, evidence *held* sufficient to warrant a verdict of guilty, where defendant was indicted under Kirby's Digest, § 1768, for assisting deceased in the commission of suicide. (Page 189.)

Appeal from Pike Circuit Court; *Jefferson T. Cowling,* Judge; affirmed.

### STATEMENT BY THE COURT.

The body of the indictment against the defendant, J. D. Farrell, is as follows:

"The grand jury of Pike County, in the name and by the authority of the State of Arkansas, accuse J. D. Farrell of the crime of murder in the first degree com-

mitted as follows, towit: In the county and State aforesaid, on the 18th day of September, 1913, one Rhoda Carter did unlawfully and feloniously commit suicide or self-murder by taking morphine and strychnine, and the said J. D. Farrell in said county and State on the 18th day of September, 1913, did unlawfully, wilfully, feloniously and of his malice aforethought and after deliberation and premeditation deliberately assisted the said Rhoda Carter in the commission of said suicide or self-murder by procuring for her the morphine which she used in the commission of said suicide and self-murder, and by advising and encouraging the said Rhoda Carter to commit said suicide or self-murder.''

The facts proved by the State are substantially as follows:

Thomas L. Turner and M. C. Turner, his wife, and Rhoda Carter were all spiritualists, and resided in Pike County, Arkansas. The defendant, J. D. Farrell, lived near them, and visited their home daily. All the parties had formerly lived in Lee County, Arkansas, and while they lived there they formed a spiritualistic circle which met at the home of T. L. Turner. When Rhoda Carter came to live with the Turners she had a son named Robert Ingersoll, about six years of age. T. L. Turner adopted her son, and he died when he was sixteen years of age. The defendant, Farrell, frequently acted as a medium at their spiritualistic meetings. The defendant moved away from Lee County and came to Glenwood, in Pike County. About a year after this, Turner and his family left Lee County and went to Boston, Massachusetts. A month or two after this, they came to Glenwood, in Pike County. This was in April, 1913. The spiritualistic circle was formed again, and the defendant sometimes acted as a medium. Some time about the middle of September, 1913, Rhoda Carter was found dead in the home of T. L. Turner. Mrs. Turner was dying, and died in a few minutes. T. L. Turner was unconscious. A physician was called in, and said that he treated Turner to try to hold up his pulse until he could

recover from what he thought to be an overdose of morphine, and that Turner responded to the treatment. Briefly stated, the testimony of the physician is as follows:

When I got there, I found that there was a bed laid down on the floor, and the woman called "Rhoda Carter" was lying next to the wall and Mrs. Turner was lying next to her, which would throw her in the middle of the bed, and Mr. Turner was lying on the other side of Mrs. Turner. Rhoda Carter was already dead, and Mrs. Turner was dying. My judgment is that their death resulted from an overdose of morphine. The appearance of their skin indicated this. I found a capsule on the floor which looked to be a No. 1 or 2 size. It had been mashed up with something white about it. A No. 2 capsule would contain three, four or five grains of morphine. About a fourth of a grain of morphine is a dose, and a capsule of the size I found filled with morphine would be sufficient ordinarily to cause death to a person taking it. Morphine poison makes some people wild and jerky, and others it will just lull off to sleep. In some it produces convulsions, and in others it does not. Rhoda Carter's body was lying perfectly straight, and her clothing was not disarranged in any way. There was nothing to indicate that either of them had had convulsions except Mr. Turner. I asked him what he had been taking and he told me strychnine. He said that he, his wife and Miss Carter had all taken a capsule about 8 o'clock the night before, and about 5 that morning they had taken another one; that they saw Miss Carter was going to die first, and that he and his wife took another one, and that his wife retained the third one she took, but that he threw his up on the floor. I saw a morphine bottle sitting on the dresser in the room. There was nothing to indicate that they had taken strychnine, and I treated Mr. Turner for morphine poison, and he responded to the treatment. He had convulsions at intervals, but when they would cease he seemed to be entirely at himself.

A paper writing was found in the room with the bodies, and it is as follows:

"To Whom It May Concern:

"Ask no questions. The bottle on the dresser will tell how it all happened. We are simply tired and we wish is that all should go together. We have wound all our affairs up and disposed of all our effects, except a few dollars, which will be found about the dresser, that will give us a cheap burial. You will find us dressed as we wish for the occasion. With malice toward none and good wishes for all mankind, we bid you goodbye.

(Signed)                    "Thomas L. Turner.
                          . "M. C. Turner,
                          "Rhoda Carter."

On the afternoon of the day the poison was taken, Mr. Turner and his wife executed a deed to the defendant to all their real estate, which was of the value of about three thousand dollars, and this deed was filed for record.

Dr. J. T. West testified: About ten days before the suicide I sold the defendant, Farrell, a drachm of morphine, for which he paid me one dollar.

T. L. Turner was introduced as a witness by the State. He proved an unwilling witness, but testified substantially as follows: I am sixty-five years old, and have known the defendant intimately four or five years. At our spiritualistic seances the defendant was one of the persons who acted as a medium. It is considered that the medium is the means by which you can commucate with those on the other side. The medium would announce the presence of a spirit, and, although not seeing it, I would talk to the spirit. The medium would give me the reply made by the spirit to the questions that I asked. My wife, Miss Carter and myself had talked of committing suicide for several years. They tell me that my wife and Rhoda Carter are dead. I do not have any recollection of taking morphine with them. I remember that I executed and acknowledged a deed to my

property to the defendant, but after that everything seems like a dream.

He was asked why he deeded his property to Farrell and said: "I suppose because we were fixing to go over on the other side, something or other. I do not know what else."

On being recalled, T. L. Turner testified as follows: I think we got the message from Robert (meaning the deceased son of Rhoda Carter) through Mr. Farrell, asking us to come over on the other side. I do not remember whether I got the message from him about making the deed to Mr. Farrell. I remember going before a notary public to acknowledge the deed, but do not remember whether Robert sent me a message about executing the deed. I remember of being on the road towards home with the deed, but do not remember anything more about it, and do not remember turning it over to the defendant.

The witness was here handed the note which was found on the dresser, and stated that the signature of his name was his own signature. He further stated that he did not have any recollection of writing the note and did not remember whether or not Rhoda Carter and his wife signed it. On cross examination he stated that he had taught spiritualism to the defendant, and said that the defendant was nearly blind, but could see out of one eye some, but that he could not see to read.

S. N. Fain testified: T. L. Turner and his wife acknowledged a deed before me on the afternoon, about 4 o'clock, before I understood they attempted to commit suicide that night. One Farrell was the grantee in the deed.

Another witness for the State testified that the defendant told him that he did not believe in spiritualism, but that it was policy for him to pretend to believe in it.

It was shown that the defendant had testified for himself on his examining trial and had admitted that he had purchased a bottle of morphine for Rhoda Carter, but said that she had told him she wanted it for the toothache.

The jury returned a verdict of guilty of murder in the second degree, and the punishment of the defendant fixed at a term of five years in the State penitentiary. From the judgment of conviction he has duly prosecuted an appeal to this court.

*Walker Rountree, T. D. Lawler* and *W. P. Feazel,* for appellant.

1. The judgment should have been arrested. 95 Ark. 48; 93 *Id.* 81. The indictment is defective. 73 Ark. 139.

2. T. L. Turner was incompetent as a witness. Greenl. on Ev., § 368; 1 Starkey on Ev., 22; 25 Ark. 447; 51 N. J. L. 432.

3. It was error to admit the "suicide pact." 16 Cyc. 1199-B.

*Wm. L. Moose,* Attorney General, and *Jno. P. Streepey,* Assistant, for appellee.

1. The indictment stated a public offense. 100 Ark. 195-6; 101 *Id.* 155; *Loudermilk* v. *State,* 110 Ark. 549; Kirby's Dig., § 1768.

2. Turner was competent. Webst. Dict. 95.

3. "Suicide pact" properly admitted as *res gestae.*

HART, J., (after stating the facts). It is first contended by counsel for defendant that the court erred in not sustaining his motion in arrest of judgment. Under our statute, the only ground upon which a judgment shall be arrested is that the facts stated in the indictment do not constitute a public offense within the jurisdiction of the court. Kirby's Digest, § 2427; *Marshall* v. *State,* 101 Ark. 155; *Jones* v. *State,* 100 Ark. 195. The indictment in this case was returned under section 1768 of Kirby's Digest, which provides that every person deliberately assisting another in the commission of suicide or self-murder shall be adjudged guilty of murder. The offense charged against the defendant being statutory, the indictment must be framed upon the statute. It is well settled in this State that an indictment for committing a statutory offense may describe the offense in the

general language of the statute, but the description must
be accompanied by a statement of the particulars essen-
tial to constitute the crime charged, and must acquaint
the accused with what he must meet upon the trial.
*Houpt* v. *State,* 100 Ark. 409.

It is insisted by counsel for defendant that there
are no allegations in the indictment charging that the
defendant, when he procured the morphine for Rhoda
Carter, or when he delivered it to her, knew that she
contemplated its use in her suicide or self-murder.   The
indictment charges that the defendant unlawfully, wil-
fully, feloniously and of his malice aforethought, and
after deliberation and premeditation, deliberately as-
sisted Rhoda Carter in the commission of suicide by pro-
curing for her the morphine which she used for that pur-
pose.   Therefore, we think that all the essentials of the
crime under the statute were set out in the indictment.
The word "feloniously" in an indictment signifies an in-
tent to commit a crime.   *Turner* v. *State,* 61 Ark. 359;
*State* v. *Eldridge,* 12 Ark. 610.   The word, in its ordi-
nary as well as legal acceptation, characterizes a mind
bent on wrongdoing, and means that the act charged pro-
ceeded from an evil heart or purpose.   We think the in-
dictment sufficiently charges that the defendant knew
that the poison which he procured and delivered to Rhoda
Carter was to be used by her for the purpose of self-
murder, and that it was given to her for that purpose.

It is next insisted by counsel for defendant that the
court erred in admitting the testimony of T. L. Turner.
The defendant objected to his testifying on the ground
that he was an incompetent witness because he was an
atheist, and introduced testimony in support thereof.
There was also a pamphlet introduced which was written
by T. L. Turner, in which he expressed a belief that there
was a God.   Our Constitution provides that "no person
who denies the being of a God shall hold any office in the
civil departments of this State, nor be competent to
testify as a witness in any court."   Constitution of Ark-
ansas, 1874, art. 19, § 1.   The opinion and belief of

men can be known only by what they have said or written, and their declarations, either verbal or written, are the proper evidence of their opinion. *Smith* v. *Coffin,* 18 Me. 157. A written pamphlet of Mr. Turner introduced before the court showed that he did believe in the existence of a God, and we are of the opinion that the court did not err in permitting him to be introduced as a witness.

It is next insisted by counsel for defendant that the court erred in admitting the note purporting to have been written by T. L. Turner, his wife and Rhoda Carter, just before they took the morphine. T. L. Turner and his wife and the dead body of Rhoda Carter were discovered lying on a bed side by side. Mrs. Turner was dying when discovered, and died in a few minutes thereafter. T. L. Turner was unconscious and was unable to have written the note in question after he was under the influence of the morphine. Turner admitted that the signature to the note purporting to be his name was his signature, but says that he does not remember whether the others signed it or not. The undisputed evidence shows that the note must have been written before the parties took the morphine. The writing of the note and the taking of the morphine with suicidal intent were all parts of the same transaction, and it would have been impossible to have fully developed the facts and circumstances surrounding the death of Rhoda Carter without admitting this writing in evidence. The note in question had a tendency to elucidate or give character to the acts of the parties, and was admissible as part of the *res gestae.* See *Childs* v. *State,* 98 Ark. 430; *Vassar* v. *State,* 75 Ark. 373; *Cornelius* v. *State,* 12 Ark. 783, at page 804. Moreover, the note was admissible because the undisputed evidence shows that Rhoda Carter committed suicide. While T. L. Turner says that he does not recollect that she took the morphine at the time he did, he does state that they had contemplated taking their lives for several years. The testimony of the attending physician shows that Rhoda Carter and Mrs. Turner died as a result of mor-

phine poisoning. The position that the bodies occupied and all the attending circumstances which we have recited in the statement of facts point unerringly to the conclusion that the parties took the morphine at the same time with suicidal intent as a result of an agreement reached by them beforehand. It is well settled in this State that there is no prejudicial error in admitting incompetent testimony of a fact that has been proved by the undisputed evidence.

Finally it is insisted by counsel for defendant that the testimony is not sufficient to support the verdict; but we can not agree with them in this contention. The testimony shows that the parties had for several years contemplated suicide. They were all spiritualists and had talked over the question of self-destruction at frequent intervals together. The defendant was a daily visitor to their house and acted as medium for them in their spiritualistic seances. Through him, acting as medium, it was shown that the deceased son of Rhoda Carter had advised them to come over on the other side. The jury might have inferred that the defendant was the one who acted as the medium in giving this advice to Rhoda Carter and the Turners, and therefore was the person who gave the advice. A few hours before they took the poison, Turner and his wife made a deed to the defendant of all their real estate, of the value of about three thousand dollars. It was shown that the defendant purchased a drachm of morphine about ten days before Rhoda Carter committed suicide, and that a bottle of this size was found on the dresser in the room where her body lay. It is true, in the examining trial the defendant testified in his own behalf and stated that he had purchased the morphine for Rhoda Carter at her request to be used by her, as she stated, for the toothache; but when we consider the quantity of morphine purchased by him, together with the other facts and circumstances adduced in evidence, we are of the opinion that the jury was warranted in believing that the defendant purchased the morphine for Rhoda Carter to be used by her and the

Turners for the purpose of self-destruction. All the facts and circumstances, as we have already stated, point unerringly to the conclusion that Rhoda Carter and Mrs. Turner committed suicide by taking morphine, and that T. L. Turner attempted self-destruction by the same means, at the same time, and that their act was the result of an agreement so to do. The other facts and circumstances adduced in evidence warranted the jury in believing that the defendant procured the morphine and delivered it to Rhoda Carter to be used by her and the Turners in their act of self-destruction. Therefore, the evidence justified the verdict, and the judgment will be affirmed.