## DAVIS *v.* STATE.

Opinion delivered December 8, 1919.

1. CRIMINAL LAW—STATEMENT MADE IN ACCUSED'S PRESENCE.—A statement by one jointly charged with the accused, made in the latter's presence and calling for a denial if untrue, is admissible in evidence, although it is not shown that accused actually heard it, where the natural thing would have been for him to hear it.

2. CRIMINAL LAW—STATEMENT CALLING FOR DENIAL.—In a murder case a statement in accused's presence by his brother, jointly indicted with him, that they were sawing wood and saw a team coming down the road, and that he jumped over a fence and stopped the team and saw deceased lying dead in the wagon bed, was a statement which called for a denial if untrue, as the statement tended to establish accused's presence at time of the killing.

3. CRIMINAL LAW—SUBSEQUENT STATEMENT OF CONSPIRATOR.—Where several persons were charged with murder, a statement made by one of them some time after the killing in the other's absence is not admissible against the other conspirators.

4. CRIMINAL LAW—RES GESTAE.—A statement by a codefendant in accused's absence, made an hour after the killing, is inadmissible as part of *res gestae*.

5. CRIMINAL LAW — ADMISSION OF TESTIMONY — HARMLESS ERROR.— Admission of evidence of a statement by a codefendant to the effect that accused was near the place of killing at the time deceased was killed, made in accused's absence, was not rendered harmless because there was other evidence that the same statement was made by codefendant in accused's presence and was not denied, nor because accused offered no testimony in denial, as his denial of guilt challenged the truth of the State's evidence.

Appeal from Lawrence Circuit Court; *Dene H. Coleman, Judge;* reversed.

*Ponder & Gibson,* for appellant; *L. B. Poindexter,* of counsel.

1. The testimony of Kell and others as to statements made by Homer Davis when he was arrested, etc., were not admissible against appellant. 75 Ark. 297-8; 91 *Id.* 490; 88 *Id.* 451; 64 *Id.* 121; 45 *Id.* 171; 42 *Id.* 380; 34 *Id.* 654.

2. Homer Davis was, according to the theory of the State, an accomplice, and a conviction can not be had

upon his testimony alone. 63 Ark. 461. The question is one of mixed law and fact. 51 *Id.* 115; 43 *Id.* 367; 63 *Id.* 462. An accomplice must be corroborated. 96 *Id.* 58; 59 *Id.* 430; 73 *Id.* 410.

3. The evidence is not sufficient to sustain the verdict. 46 Ark. 149; 97 *Id.* 159. There must be substantial proof. 67 *Id.* 417.

*John D. Arbuckle,* Attorney General, and *Robert C. Knox,* Assistant, for appellee.

The testimony of Kell and others as to the statements made by Homer Davis when he was arrested and in the presence of appellant, was admissible and was not such as to call for a reply from him. Defendant's objections were general and could raise only the competence of the evidence. 69 Ark. 313. This evidence was secondary and proper when the necessary foundation was laid, which was that he heard the remark. 76 Ark. 400. The evidence fully sustains the verdict.

HUMPHREYS, J. Appellant was jointly indicted with his brother, Homer Davis, and separately tried and convicted for the murder of Charles Whittaker, in the Western District of Lawrence County, and adjudged and sentenced to life imprisonment in the penitentiary as a punishment therefor. From the judgment of conviction, an appeal has been duly prosecuted to this court. Appellant introduced no evidence. The history of the crime, according to the State's evidence, is, in substance, as follows: Charles Whittaker borrowed a wagon from R. G. Ritchie, residing west of Homer Davis' home, on the morning of December 13, 1917, to move Jim Phillips and wife, who resided east of the Homer Davis home. At the time he borrowed the wagon, Ernie Davis, a younger brother of Homer and appellant, was at Ritchie's and left before Whittaker. Whittaker left about fifteen minutes thereafter, going east. He stopped awhile and talked to J. M. Headrick, who resided about two hundred yards west of the Homer Davis home. From the Headrick home, he proceeded on his way, standing in his wagon and smoking a pipe, and, in this position, passed out of

Mr. Headrick's sight, on account of a hill situated between the two houses, which served as an obstruction to the view. Time enough had elapsed for Whittaker to reach Homer's home when a shot was heard by Mr. Headrick in that direction. Shortly after the shot, the dead body of Whittaker was found lying diagonally across the bed of the wagon dead, with a gunshot wound in the right-hand side of the skull, behind the ear. The shot entered from behind. There were no powder burns. Snow was upon the ground, and there was a pool of blood in about fifteen feet from the gate, in front of Homer's house, which had the appearance of being covered up with a corn scoop. There were tracks between the house and pool of blood. A scoop which fit in the marks made near the blood was on Homer's porch. Blood was found on the porch and doorknob. Some gun wadding was found on a direct line between the pool of blood and a little house that stood in the yard. Blood appeared at intervals between the house and where the dead body was found, but none was found west of the house in the direction from which Whittaker came. In an hour or so after Whittaker was killed, John Selsor, who had met him going in the directtion and about twenty rods west of Homer's house, in passing back that way, saw Homer and his wife in their buggy fixing to leave, and observed Oliver Davis and his mother on Homer's porch. Oliver Davis resided with his father about 200 yards from Homer's dwelling. Bad feeling existed between Whittaker and the Davis family. That night, Homer and Oliver were arrested and placed under guard at their father's home.

Over the objection and exception of appellant, three witnesses, L. W. Kell, John Jean and J. M. Headrick, were permitted to testify as to a statement made by Homer in the presence of Oliver during the time they were being guarded. The statement, according to witness Kell, the deputy sheriff, was as follows: "Homer made this statement, I think that night, that he and Oliver were sawing wood, just across the fence there and seen a team coming down the road, and thought it was Tom Hall's

team, and he ran out and caught the team and seen it was Charley Whittaker and hung up the lines on the wagon bed and let them go on.''

According to witness, J. M. Headrick, as follows: ''Well, Mr. Homer Davis said that he was not uneasy, that they had not done anything to be uneasy for; that him and Ol. was there sawing wood and he looked up the road and saw the team coming and thought it was Tom Hall's team running away, and he just jumped over the wire fence, he says, and caught them; and about that time he looked back, he said, into the wagon, and saw it was Charley Whittaker, and that he was shot or dead—I don't remember exactly which word he used—but anyhow saw it was Charley Whittaker in the wagon, and he just hung his lines up on the corner of the wagon bed and let them go on.''

According to witness John Jean, as follows: ''And they (Homer and Oliver) were sawing wood and they seen a team coming along without any driver and coming in a pretty pert gait and Homer said he run out to head the team and stopped them and kinder peeped up and seen who was in the wagon; seen who it was and said it was just such a shock to him and unnerved him so he just had to sit down, and did. And he throwed the lines up on the wagon bed and turned the team loose and it went on.''

Over the objection and exception of appellant, R. G. Ritchie was permitted to testify that, in appellant's absence, about one hour after the tragedy occurred, he passed Homer's home and hollowed to Homer and asked, ''What on earth is the matter with Charley down there?'' And Homer said, ''God, I don't know. I seen the wagon come running down the hill there and I thought it was Tom Hall's team and I jumped over the fence and stopped them and went back to where the wagon was and it was Charley Whittaker and I turned them loose and let them go on down the road.''

Appellant insists that the statement made by Homer Davis to D. W. Kell, John Jean and J. M. Head-

rick was not competent, because, first, it was not shown that appellant heard the statement; and, second, because the statement contained nothing which called for an explanation or denial on his part.

(1)   The witnesses all said the statement was made at the time Homer and Oliver were arrested and placed under guard at their father's home, and in the presence of Oliver.   It is hard to realize how a statement made under these circumstances could have escaped the attention of appellant.   The natural thing would have been for him to hear it, and the jury were warranted in so finding.

(2)   The statement tended to establish appellant's presence at the time the tragedy occurred, and, in the opinion of a majority of the court, if believed by the jury, when taken in connection with all the other facts and circumstances in the case, tended to connect him with the crime.   Therefore, the jury were warranted in finding that the statement called for a denial on his part, if not present.

It is also insisted that the court committed reversible error in admitting the statement made by Homer Davis to R. G. Ritchie in the absence of appellant.   This statement was admitted as substantive evidence against appellant, on the theory that it was the statement of a co-conspirator in the crime.   Its admission cannot be justified on that ground, because it was made in the absence of appellant and after the conspiracy, if one existed, had been completed.   Its introduction cannot be justified on the ground that it was a part of the *res gestae* because more than an hour intervened between the commission of the crime and the time the statement was made.   The evidence was clearly incompetent, but, conceding it to be so, the learned Attorney General insists that it was not prejudicial for the reason that a statement of like nature was established by the undisputed evidence of other witnesses made by Homer in the presence of appellant while under guard at their father's home.

In felony cases, when the defendant pleads not guilty and introduces no evidence, juries are not required to accept as conclusive evidence of the State, though uncontradicted. Under such circumstances, the denial of guilt challenges the truth of the State's evidence, and it cannot be said that the State's testimony is undisputed though uncontradicted by testimony on the part of defendant. Had appellant introduced testimony on the point, which coincided with that of the State, then it might be said with reason that there was no dispute in the evidence. This court, in the case of *Parker* v. *State,* 130 Ark. 234, quoted with approval from the case of *United States* v. *Taylor,* 11 Fed. 470, as follows:

"'By his plea of not guilty, the defendant must be understood as denying the truth of the information or indictment, and as not conceding the truth of what the witnesses for the government have sworn to. This is so notwithstanding the fact that no witness for the defendant contradicted the statements of the witnesses for the prosecution. In this condition of the testimony it was the right of the jury to pass upon the credibility of the witnesses, even if unimpeached as to character, and to consider whether, upon applying all the tests of manner, clear or confused statement, prejudice and accuracy of memory, they were to be believed. It was within the province of the jury to disbelieve the witnesses for the government.' See also *Territory* v. *Kee* (N. M.), 25 Pac. 924; *State* v. *Wilson,* 62 Kan. 621, 52 L. R. A. 679; *State* v. *Godman,* 145 N. C. 461, 123 A. S. R. 467; *Huffman* v. *State,* 29 Ala. 40; Thompson on Trials (2 Ed.), vol. 2, sec. 2149."

It may be that the jury accepted the testimony of L. W. Kell, John Jean and J. M. Headrick because in part corroborated by this testimony of R. G. Ritchie. It was within the province of the jury to treat this testimony as corroborative of the statement made in the presence of Kell and others, and, if they did so, it necessarily played a part in bringing about the conviction

of appellant. It was, therefore, material and not merely cumulative.

The question of whether the verdict and judgment are supported by sufficient legal evidence is eliminated by our conclusion that the court admitted incompetent evidence to the prejudice of appellant's right.

For the error indicated, the judgment is reversed and the cause remanded for a new trial.

McCULLOCH, C. J., (dissenting). The statement of Homer Davis to R. G. Ritchie was purely self-serving and did not tend to connect appellant with the commission of the crime, as did the testimony of the other three witnesses who gave testimony concerning statements of Homer Davis, and the testimony of Ritchie could not have had any effect prejudicial to appellant. Besides, the substance of the statement to Ritchie was embraced in the statement to the other three witnesses, Kell, Jean and Headrick, and the testimony of those three witnesses was undisputed.

The rule has frequently been laid down by this court that in a criminal case as well as in a civil case the admission of incompetent evidence should be treated as harmless, and not to cause a reversal of the judgment, where the fact sought to be proved was established by other undisputed evidence. *Lee* v. *State,* 78 Ark. 77; *Renfroe* v. *State,* 84 Ark. 16; *Farrell* v. *State,* 111 Ark. 180; *Taylor* v. *State,* 113 Ark. 520; *Kelley* v. *State,* 133 Ark. 261.

In the case of *Farrell* v. *State, supra,* we said: "It is well settled in this State that there is no prejudicial error in admitting incompetent testimony of a fact that has been proved by the undisputed evidence."

It is not discoverable in any of the opinions in the cases cited above that the testimony can only be treated as undisputed where the accused has introduced testimony on the point "which coincided with that of the State." In fact, a perusal of the cases cited above will show that in most of them, if not all, the undisputed evidence was adduced by the State. However, it is unim-

portant, I think, the source from which the undisputed evidence emanates, for if it is undisputed and uncontradicted, so that the jury has no right to arbitrarily reject it, then there can be no harmful result flowing from the introduction of incompetent evidence tending to establish the same fact.

Appellant adduced no testimony in the trial of this case, and the statements of his brother, Homer Davis, were proved by the undisputed testimony of three unimpeached witnesses. One of them was the deputy sheriff who made the arrest, and there was not the slightest hint in the argument of counsel of the existence of any ground for questioning the testimony of those witnesses.

I think the judgment should not be reversed for an error which obviously could not have had any harmful effect.