## GILCHRIST *v.* STATE.

### Opinion delivered October 9, 1911.

1. HOMICIDE—INVOLUNTARY MANSLAUGHTER—INSTRUCTION.—Where, in a prosecution for murder committed by shooting another with a loaded gun, defendant admitted that he pointed the gun at deceased and pulled the trigger, and that he made no effort to ascertain whether the gun was loaded or not, it was not error to refuse to instruct the jury that defendant could not be convicted of involuntary manslaughter unless he acted in such a negligent manner that the law imputes criminality to his acts. (Page 335.)

2. SAME—INSTRUCTION AS TO DEFENDANT'S YOUTH.—In a prosecution of a youth between 15 and 18 for murder it was not error to refuse an instruction that the jury might consider his age in determining whether the defendant acted with premeditation and deliberation, where general instructions given by the court told the jury to consider all the evidence and base their verdict on it. (Page 336.)

3. SAME—EVIDENCE.—In a prosecution for murder it was not error to refuse to permit the defendant to prove that the deceased had been driven from home by his mother a short time before he was killed, where defendant was permitted to show that the deceased at the time he was killed was in an ill humor. (Page 337.)

4. SAME—PREMEDITATION.—To constitute the killing of a human being murder in the first degree, there must be a specific intent to take life; and if the killing is the result of deliberation and premeditation, it is sufficient, though it be the conception of a moment. (Page 337.)

5. APPEAL—CONCLUSIVENESS OF VERDICT.—A verdict will not be disturbed on appeal if there is substantial evidence to support it. (Page 338.)

6. HOMICIDE—VERDICT.—In a prosecution for murder in the first degree, one of the jurors handed the court a verdict finding the defendant guilty, as charged in the indictment, and leaving the punishment to the court. The court told the jury: "In murder cases the law requires you to fix the degree of guilt, whether murder in the first degree or second degree, or some lower degree of homicide." Thereupon one of the jurors replied: "The indictment is for murder in the first degree." The court said: "Do you mean to find him guilty of murder in the first degree?" To which one of the jurors replied: "Yes." The court wrote into the verdict, after the word "guilty," the words "of murder in the first degree," and struck out the words as to leaving the punishment to the court. The jurors were polled, and each juror announced that this was his verdict. Held, no error. (Page 339.)

Appeal from Pulaski Circuit Court; *Robert J. Lea*, Judge; affirmed.

### STATEMENT BY THE COURT.

Earl Gilchrist was indicted for murder in the first degree, charged to have been committed by killing Will Longley in Pulaski County, Arkansas. He was tried by a jury, and convicted as charged. By this appeal he seeks to reverse the judgment rendered.

The evidence adduced at the trial on the part of the State tended to show substantially the following facts:

On the 4th day of June, 1911, the defendant and some other negro boys began throwing rocks at each other near a schoolhouse in the southwestern part of the city of Little Rock in Pulaski County. The boys commenced the rock throwing in play, but ended in a real fight. After they had thrown at each other for a time, Jones Gilchrist, a younger brother of the defendant, went home after a pistol and brought it back with him. Robert Scott grabbed Jones Gilchrist and held his coat. The defendant told Robert to turn his brother loose, and cut at the throat of Carlton Ross. Carlton then threw a rock and hit the defendant. By that time Jones had the pistol out of his bosom, and gave it to the defendant. The defendant started to shoot Robert Scott. Robert dodged, and then he started to shoot Carlton Ross. Will Longley jumped in front of Earl, and after a scuffle, took the pistol away from him. He told the defendant that he was going to carry the pistol home and give it to the defendant's mother. Longley then put the pistol in his hip pocket, after first extracting the cartridges

from it, and started towards defendant's home, intending to go in the back way.

The defendant was bare-headed, and ran on ahead crying. He went into the house by the front door, and came out with a shotgun. He ran towards the deceased, Will Longley, and the other boys, who were about fifty feet away from the house.

The defendant and the deceased each took a position behind a pine tree about nine or ten feet apart. The deceased was dodging behind his tree just before the shooting began, trying to keep defendant from shooting him. In about a minute the defendant got aim on Longley, fired the gun, and Longley fell, dying in a short time. While the deceased was lying on his face, the defendant pulled him over on his side, and took the pistol out of his pocket. He then took the pistol and shotgun, and started home with them.

Longley did not have the pistol in his hand, and was not endeavoring to shoot defendant when he was shot. He lived only a short time after receiving the gunshot wound.

Earl Gilchrist testified in his own behalf substantially as follows: "Some time after we commenced the rock·throwing, one of the boys hit my little brother. He went home and got a pistol to make them stop throwing at us. The boys were still throwing at us when he returned, and I said: 'Let me have the gun, and I'll make them stop throwing at me.' I advanced towards the boys, and they got out of the way. Will Longley came up, and raised me off the ground, trying to take the pistol away from me. I told him to let me alone. After a while he took it away, and put it in his left hip pocket. While I was trying to take the pistol out of his pocket, he hit me twice in the mouth, and knocked me against the fence. My mouth commenced bleeding, and I ran home. I ran to the house, grabbed up the gun, jumped over the back fence, and met the boys coming. I drew the gun on Longley. He pulled out a pistol, ran behind a tree, and drew it down on me, saying: 'I will kill you,' at the same time calling me a vile name. Fred Harrison said to him: 'Don't you shoot that boy.' I didn't know anything was in the shotgun. I was just trying to make him give my pistol back. We were each behind a tree, and each was dodging back and forth. Finally I snapped the

gun, and Longley fell face forward, with his hands thrown back that way (indicating), with the pistol ten feet from him. I went over and picked up the gun. I ran home, threw down the gun, and ran out the front door."

He said that he did not try to shoot the boys with the pistol, but was only brandishing it trying to keep them off. He also said that he did not think the gun was loaded, and he was only trying to bluff deceased to get his pistol back.

On cross examination, he testified that he didn't intend to kill Longley to get his pistol: that he looked for the gun about two minutes; that he didn't put any cartridges in it, but just grabbed the gun and ran out the back door; that when Longley pulled out the pistol he got behind a tree; that Longley was behind another tree about ten feet distant; that Longley tried to get aim on him for about ten minutes; that he fired on Longley without taking aim.

The father of the defendant testified: "I am the father of Earl Gilchrist, the defendant. He is fifteen years old. He was born on the 21st of June, 1896. It was my custom and warning to the boys never to let the gun be loaded in the house. I charged them, when they would go out hunting, not to load it until they got out of the city limits, and to unload it when they reached the city limits, and never to let it stay in the house loaded." On cross examination, he said there was ammunition in the house, and that it wouldn't take long to put shells in the gun.

The mother of the defendant testified that Earl was fifteen years of age. Anna Longley, mother of the defendant, and Mrs. Frances Morgan in rebuttal testified that about five years before, Mrs. Gilchrist had told them that the defendant was at that time thirteen years of age. On cross examination, Mrs. Morgan said she was not positive that Mrs. Gilchrist had told her this.

Fred Harrison testified that Longley did not hit the defendant after he took the pistol, and that he never told Will Longley not to shoot the defendant.

Additional facts will be stated or referred to in the opinion.

*J. H. Harrod*, for appellant.

1. Appellant testified that he did not know the gun was

loaded, etc:, and was corroborated by his father.    Whether this testimony appears to the court to be reasonable or not, the appellant was entitled to instructions to meet the views reflected by his testimony.    52 Ark. 45.    The court therefore erred in refusing to give instruction 5 requested by appellant.

2.   By refusing to give the above instruction and also the sixth, to the effect that in determining whether the defendant acted so negligently as to make his act criminal the jury might consider his age, his acts and conduct being considered in the light of the discretion and experience one of his years is presumed to possess, the court deprived the jury of considering the proposition that the defendant's act was involuntary manslaughter or murder in the second degree.

3.   The court erred in refusing the seventh instruction. Certainly, in determining whether or not appellant's act was premeditated and deliberate, the jury ought to have been permitted to consider his act in the light of the discretion and experience one of his youth is presumed to possess.

4.   It was material and relevant to show the state of mind of the deceased, Longley, and the court erred in excluding such testimony.    62 Ark. 254.

5.   The evidence does not sustain the verdict.    The evidence on the part of the State, without considering that of the appellant, makes out nothing more than a case of manslaughter.    Every element of murder in the first degree is absent.

6.   There was error in the proceedings connected with the return of the verdict.    When the verdict returned by the jury was found to be defective, the court, after pointing out its defects, should have sent the jury back to the jury room to consider further of their verdict.    21 L. R. A. (N. S. ) 782.

*Hal L. Norwood,* Attorney General, and *William H. Rector,* Assistant, for appellee.

1.   The court properly refused to give the fifth and sixth instructions requested by the appellant, because (1) the court had already covered as much of these instructions as was the law in the instructions given, and (2) they did not properly state the law.

2. There was no error in refusing to give the seventh instruction requested. 37 Ark. 261; 72 Ark. 117; 35 L. R. A. 196.

3. There was no connection whatever between the acts of deceased's mother and those of the appellant, and the court quite correctly, after admitting testimony to show the state of mind of the deceased and to this end admitting testimony showing that he was in an ill humor, excluded the testimony offered to show the cause of the ill humor. It was utterly irrelevant.

4. The evidence sustains the verdict. There is not wanting evidence upon which to base the finding of malice, premeditation and deliberation. Wharton on Homicide, (3 ed.) 156; 72 Ark. 464; 47 Ark. 562. As to the length of time necessary to intervene between the formation of the purpose to kill and its execution in order to make of the act murder in the first degree, see Wharton on Homicide, (3 ed.) § 137; 51 Ark. 189; 11 Ark. 455; 25 Ark. 405; 26 Ark. 339; 37 Ark. 256; 40 Ark. 525; 66 Mo. 13; 58 Pa. St. 9; 91 N. Y. 211; Bishop, Crim. Law, (7 ed.) § 728; Wharton, Crim. Law, (9 ed.) § 380.

5. There is no reversible irregularity in the manner of receiving the verdict. Appellant did not object at the time, but, on the contrary, asked that the jury be polled, which was done, and the result of the poll was to show that the verdict, as corrected, was the unanimous verdict of the jury.

HART, J., (after stating the facts). 1. Counsel for the defense assigns as error the action of the court in refusing to give the following instruction: "5. If the defendant thought the gun was not loaded, he cannot be convicted of any crime greater than involuntary manslaughter, and not of involuntary manslaughter unless he acted in such a negligent manner that the law imputes criminality to his acts."

The court did not err in refusing this instruction. The defendant admits that he pointed the gun at the deceased and pulled the trigger. It was an unlawful act, punishable by a fine. Acts of 1907, c. 330. Therefore, under his own testimony considered in its most favorable light, he was guilty of involuntary manslaughter. Moreover, the defendant admits that he made no attempt whatever to ascertain whether the gun was loaded before he pointed it at the deceased and snapped it. This was negligence on his part. It is involun-

tary manslaughter where the death of another occurs through the negligent use of a dangerous agency. *Ringer* v. *State,* 74 Ark. 262; *Mabry* v. *State,* 80 Ark. 345.

2. Counsel for the defense contends that the court erred in refusing the following instruction: "7. You may, in determining whether the defendant did or did not act with premeditation and deliberation, consider his age."

According to the testimony adduced by the defendant, he was fifteen years of age, and according to the testimony of the State he was eighteen years of age. Under the law, from the age of fourteen years, an infant is presumed to be capable of committing crime, and of being responsible therefor in the same manner as in the case of an adult. Underhill on Criminal Evidence, § 20; Wharton's Criminal Law, (10 ed.) vol. 1, § 68; Bishop, New Criminal Law, § 368.

Of course, in arriving at a verdict, the jury should consider the age of the defendant in connection with all other facts and circumstances adduced in evidence. In other words, it is the duty of the jury to consider all the evidence and base their verdict on it when considered as a whole. This they were required to do under the general instructions given by the court. It was not error for the court to refuse to select a single fact, and suggest to the jury what effect they might give to it. It has often been said by this court that instructions should not be based on isolated facts, but should be so framed that all parts of the evidence should be considered and weighed by the jury. *Newton* v. *State,* 37 Ark. 333; *Carpenter* v. *State,* 62 Ark. 286; and cases cited; *Hogue* v. *State,* 93 Ark. 316; *Ince* v. *State,* 77 Ark. 418.

In the case of *Hogue* v. *State, supra,* the court said: "The practice of framing separate instructions on distinct circumstances, and thus, as it is said, singling them out, is not commendable, and it has been held by this court in several decisions that it is not error to refuse such instructions. *Carpenter* v. *State,* 62 Ark. 286; *Ince* v. *State,* 77 Ark. 418. But the giving of such an instruction is not prejudicial error where the court in the whole charge directs the jury to consider all the facts and circumstances proved in the case, and especially where, as in this case, the court instructs that the facts and circumstances in evidence shall be consistent with each other and with

the guilt of the defendant, and inconsistent with any reasonable theory of defendant's innocence."

In the instant case the court refused to give the instruction, and there was no error committed thereby.

3. Counsel also charged that the court erred in refusing to give the following instruction: "6. In determining whether the defendant acted so negligently as to make his act criminal, you may consider his age, and his acts and conduct are to be considered in the light of the discretion and experience one of his years is presumed to possess."

This instruction is subject to the defect pointed out in instruction No. 5, and as well in that contained in No. 7 *supra.*

4. It is next contended that the court erred in refusing to allow defendant to show that the deceased had been driven from home by his mother a short time before he was killed. Counsel insist that such testimony tended to throw light on the state of defendant's mind. The court did allow counsel for defendant to show that Longley was in an ill humor, but did not allow him to go into the cause of it. The action of the court was correct. There was no connection whatever between the acts of the mother of the deceased and the acts of the defendant. It was entirely irrelevant to the issue under investigation, and had no connection with the case. It could not in any manner have tended to prove or disprove the innocence of the defendant. When the defendant proved that the deceased was in an ill humor, he had gone as far as he had a right to go into that question, because there is no connection whatever between the acts and conduct of the mother of the defendant and the acts and conduct of the defendant.

5. It was earnestly insisted by the counsel for the defendant that the verdict is not supported by the evidence. The law in the case is clearly stated in *Green* v. *State,* 51 Ark. 189, as follows: "In order to constitute the killing of a human being murder in the first degree, there must be a specific intent to take life formed in the mind of the slayer, before the act of the killing was done. It is not necessary, however, that the intention be conceived for any particular length of time before the killing. It may be formed and deliberately executed in a very brief time. If it was the conception of a moment,

but the result of deliberation and premeditation, reason being on its throne, it would be sufficient. The law fixes no time in which it must be formed, but leaves its existence as a fact to be determined by the jury from the evidence."

The evidence on the part of the State shows that the defendant and the other boys began to play by throwing rocks at each other, and that they finally became mad and began to fight in earnest; that the defendant first attempted to cut the throat of one of the boys with a razor; that as soon as his brother came up with the pistol he took it and endeavored to shoot two of his companions; that when Longley took the pistol away from him, he went home and came back with his father's shotgun; that on his return with the gun he met Longley and the other boys coming toward the house, where Longley had previously stated that he was going to give the pistol back to deceased's mother. The defendant took his position behind one tree, and Longley took another about ten feet distant. Longley kept dodging back and forth behind the tree, and as soon as the defendant got him within range of his gun he fired. It is also true that the defendant testified that at the same time the deceased was trying to shoot him, but this is denied by all the witnesses of the State. All of them state that deceased was going to defendant's ho ne for the purpose of giving the pistol to defendant's mother; that the pistol was in his right hip pocket, and that he made no attempt whatever to draw it or in any way to injure the defendant.

If the testimony of the State's witnesses is to be believed, the deceased gave the defendant no provocation whatever, either by words or acts, to kill or injure him. According to their testimony, the circumstances accompanying the killing show a deliberate and premeditated design on the part of the defendant to kill Longley. According to the settled rules of this court, the verdict cannot be disturbed on appeal where there is substantial evidence to support it. The defendant was presumed to have intended the natural consequences of his acts, and we cannot say there was no substantial evidence to sustain the verdict. See *Beene* v. *State,* 79 Ark. 460.

6. Counsel for the defendant complains of certain alleged irregularities connected with the return of the verdict.

The jury was asked by the court if they had agreed on a verdict. R. W. Porter, one of the jury, replied that they had, and the court said: "Hand it up." We here copy from the record as follows: "Therefore R. W. Porter, one of said jury, hands the court the following: 'We, the jury, find the defendant guilty as charged in the indictment and leave the punishment to the court. (Signed) R. W. Porter, Foreman.' The court looked at the verdict, and read it over to himself, and said: 'Gentlemen of the jury, in murder cases the law requires you to fix the degree of guilt, whether murder in the first degree, or second degree, or some lower degree of homicide.' Thereupon one of the jurors replied: 'The indictment is for murder in the first degree.' The court said: 'Do you mean to find him guilty of murder in the first degree?' to which some one of the jury replied: 'Yes.' At this point counsel for the defendant said to the court: 'Is your Honor sure that the jury understands that the punishment for murder in the first degree is death?' and they replied that they did. Thereupon the court wrote into the verdict, after the word 'guilty,' the words 'of murder in the first degree,' and struck out the words 'and leave the punishment to the court.' When the verdict had been so written, the court read the same, and asked the jury if that was their verdict, and they replied that it was. Therefore defendant's counsel asked that the jury be polled. This was done, and each juror announced that it was his verdict."

This is not a matter for which the judgment should be reversed. To do so would be to put form above substance. It is manifest from the record that each member of the jury had voted to convict the defendant of murder in the first degree, and intended to return such verdict into court. The court in its instructions had told the jury that the punishment for murder in the first degree is death, and the jury seems to have thought it necessary for the punishment to be fixed by them or by the court; but when reminded by the court that the law fixes the punishment for murder in the first degree, and that they had been so instructed, and, upon being further asked by the court if they intended to find the defendant guilty of murder in the first degree, the jury answered: "Yes."

We think there can be no doubt but that the jury intended

by their verdict to find the defendant guilty of murder in the first degree. In any event, it is certain that the court asked the jury if they meant to find the defendant guilty of murder in the first degree, and the jury through their foreman so declared their verdict. When the jury were polled, each member adhered to the verdict. Therefore the record shows that the jury returned a verdict of murder in the first degree, and the court properly received it.

All the cases concur that the jury have full power over their verdict, and may amend it, or recede from it, at any time before it has been received and recorded, and themselves have been discharged from the case.

The court in its instructions covered every phase of homicide. The instructions were full and fair to the defendant. He was convicted by the jury upon evidence which we have held warranted the verdict.

Therefore, finding no prejudicial error in the record, the judgment must be affirmed.

FRAUENTHAL, J. I dissent from the opinion of the majority of the court in this case, for the reason that I believe the lower court committed an error which was prejudicial to the rights of the defendant by refusing to specifically instruct the jury in effect that, in determining whether or not he was guilty of the crime of murder in the first degree, they should take into consideration his infancy and the resultant incapacity that there might be, if any, to form that deliberate intent and premeditated purpose required by the law to constitute this highest degree of homicide. To constitute the crime of murder in the first degree, there must be a state of mind of the accused described by the expressions "premeditation" and "deliberation." It is true that the law can fix no definite time within which the specific intent and deliberate purpose of the mind to slay must exist and continue in the accused. But this premeditation and deliberation must be shown by the evidence to so exist in the mind of the accused before conviction can be had of murder in the first degree, and the necessity for such proof cannot be frittered away or dispensed with.

In determining whether or not these two essential ingredients of the crime of murder in the first degree do exist in the mind of the slayer, the mental capacity and maturity of the

accused, as well as all the facts and circumstances surrounding
the deed at the time of its perpetration, should be fully con-
sidered. For if the mind of the accused is so immature, by
reason of infancy, that it forms sudden impressions and acts
upon these impressions hastily, indiscreetly and thought-
lessly, then it may lack that maturity of purpose which the
law requires before guilt of this highest crime can be fastened
upon the accused. From the beginning, the law has made a
distinction between the acts of an infant and those of an
adult, on account of the immaturity, indiscretion and thought-
lessness of infants. The responsibility of an infant for crime
depends greatly upon his discretion and maturity of mind,
upon his capacity not only to discriminate right from wrong
but also his discretion to know what is proper and just from
what is the thoughtless and reckless act of a child. The law
on this account divides the stage of infancy into three periods,
in order to determine the accountability of the infant for crime.
By our statute, an infant is conclusively presumed to be in-
capable of appreciating and understanding the nature of a
crime up to the age of twelve years, and during that period
he cannot be held responsible therefor, whether it is a felony
or a misdemeanor. From the age of twelve to fourteen years,
he is presumed still to be incapable of committing crime,
but this presumption may be rebutted by the prosecution
showing that he has sufficient mental capacity and discretion
to understand and appreciate the crime committed by him,
the same as a matured adult. After the age of fourteen,
the infant is presumed capable of committing crime, and of
possessing that full discretion and understanding which fastens
responsibility upon the adult. But the possession of this
capacity and discretion by an infant is not a conclusive pre-
sumption, even after he has passed the age of fourteen, like
that which is imputed to an adult. It is a presumption only,
which can still be rebutted by proof.

This proof can be made by affirmative evidence of im-
maturity, indiscretion and incapacity to form the premeditated
intent and deliberate purpose required by the law to constitute
murder in the first degree; but it can also be shown by the facts
and circumstances which attend the commission of the crime.
When this is shown—when it is proved by testimony discon-

nected with the crime, or by the facts and circumstances attending its commission that the infant did not possess sufficient discretion, understanding and capacity to commit the crime of murder in the first degree—then he cannot legally be declared guilty of such highest degree of that crime, although he is beyond the age of fourteen years.  I think that it is proper in a given case to call the jury's attention to this phase of the law by a specific instruction to that effect.

In the case at bar, this is substantially what counsel for defendant requested the court to do.  In effect, he asked the court to instruct the jury that, while an infant may be guilty of this crime after he has passed the age of fourteen years, still the fact of his infancy may be taken into consideration by the jury in determining whether or not he had that maturity, discretion and capacity to commit the degree of crime in question which is found in the mind of an adult.  Such a specific instruction, I think, was called for by the facts and circumstances attending the commission of the crime in this case.

The testimony on the part of the defendant tended to prove that he was fifteen years old, and on the part of the State it tended to prove that he was eighteen.  A number of boys of like age had congregated, and were engaged in the somewhat reckless play, yet thoughtless boyish sport, of throwing rocks at each other.  This continued for some time until it aroused anger in some of the boys, and then a disposition to fight. Deceased, either because he was older or physically stronger than defendant, took from him a pistol which he was displaying in a wrongful and reckless manner—yet still in a way which characterized the act as that of a thoughtless and indiscreet boy.  Actuated by sudden resentment, the defendant ran, bareheaded and crying, to his home, which was a short distance away, and there grasped a gun, without examining it, or seemingly considering whether it was loaded or not. Still bareheaded and crying, he ran back to the scene where the homicide occurred, and almost immediately fired the gun at deceased.  During all this time he was laboring under great excitement.

The facts and circumstances attending this killing, I think, were sufficient to present to the jury the question as to whether or not the defendant, on account of his infancy, although over

the age of fourteen years, had that discretion and matured capacity which is sufficient to form that premeditation and to exercise that deliberation necessary under the law to constitute murder in the first degree. Such question being presented by the evidence itself, I think the defendant was entitled to a specific instruction calling the jury's attention to this as a phase of the law.

The general instruction given to the jury relative to the responsibility of an infant after passing the age of fourteen years did not, in my opinion, sufficiently call to the attention of the jury this phase of the law in the light of the facts and circumstances adduced in evidence, and on this account the jury may have been misled into the belief that the infancy of the defendant was an immaterial matter in determining the degree of his guilt after he had passed the age of fourteen. This view is accentuated, I think, by the verdict which was returned.

The jury returned a verdict, in which they stated that they found the defendant guilty as charged in the indictment (it was subsequently amended so as to say murder in the first degree), and that they left the punishment to the court. It may be that the jury understood from the general instruction given that after an infant arrives at the age of fourteen years he is responsible for crime to the same extent as an adult under any and all circumstances, and that no discretion was given to them to find him guilty of a lower degree, although they may have thought from the facts and circumstances that his act resulted from the immaturity, indiscretion and thoughtlessness of an infant. It is probable, from this verdict, that the jury thought the court had the right to make this distinction, and thus to fix the extent of the punishment. By the law, the punishment could only be death if the jury found defendant guilty of murder in the first degree. If the jury had fully understood this and the result of their verdict, it does not seem that they would have stated in their verdict that they left the punishment to be fixed by the court.

Mr. Justice WOOD is of the opinion that the proceedings upon the return of the verdict were irregular, calling for a reversal. The jury should have been permitted to retire to consider, in a more deliberate manner, further of their

verdict when it appeared therefrom that they understood that the amount of the punishment could be fixed by the court, and therefore that the jury themselves had not considered and determined it. Under the circumstances of the case, and the manner in which the jury were formally permitted to write, and thus in effect arrive at their verdict, in open court, he does not think that there was an opportunity given to the jury to consider the verdict and its effect with that degree of deliberation which the law requires in a case fixing the crime as murder in the first degree.