KELLEY v. STATE.

Opinion delivered March 18, 1918.

1.  EVIDENCE—INCOMPETENT TESTIMONY—HARMLESS ERROR.—The admission of incompetent testimony which is nonprejudicial constitutes harmless error.

2.  CRIMINAL LAW—EVIDENCE—HOMICIDE—COURSE OF BULLETS.—In a prosecution for homicide, a person who arrived upon the scene shortly after the shooting may testify as to where one of the shots struck the wall, and that a next door neighbor brought him a bullet which had penetrated into the latter's house.

3.  CRIMINAL LAW—HOMICIDE—STATEMENTS—RES GESTAE.—Evidence of statements made either by the accused or by some one in his presence, made during the shooting, are admissible as part of the res gestae.

4.  CRIMINAL LAW—HOMICIDE—STATEMENTS OF ACCUSED.—Where defendant was accused of homicide, testimony of a witness that eight hours before the killing that defendant threatened to kill a certain automobile mechanic if he stayed with a certain woman, is admissible, where deceased was an automobile mechanic,

and was found staying with the woman named, when defendant shot him.

5. CRIMINAL LAW—HOMICIDE—TESTIMONY OF ABSENT WITNESS BEFORE CORONER.—The testimony of a witness taken before a coroner, *held* admissible, it appearing that the witness was without the State.

6. EVIDENCE—TESTIMONY TAKEN ON FORMER OCCASION—IDENTIFICATION.—In a homicide trial, the testimony of an absent witness, taken before the coroner by a stenographer, may be read at the trial, and may be identified by one who can recall the substance of it. It need not be identified by the stenographer.

7. HOMICIDE—EVIDENCE—SELF-DEFENSE—OWNERSHIP OF WEAPON.—In a prosecution for homicide, defendant claimed that deceased first threatened him with a knife; *held*, evidence of the ownership of the knife was competent, where another witness had testified that deceased had not used the same.

8. CRIMINAL LAW—EVIDENCE—CROSS-EXAMINATION OF ACCUSED—FORMER CONVICTION.—In a criminal prosecution, where the defendant takes the stand as a witness he may, on cross-examination, be asked concerning a former conviction for a felony in another State.

9. TRIAL—UNDISPUTED TESTIMONY—REMARK OF TRIAL COURT.—No prejudice held to result from a comment by the trial judge upon an undisputed piece of testimony.

10. CRIMINAL LAW—SUMMONS OF WITNESS.—It is immaterial whether a witness attends court in response to a summons by telephone or by having a subpoena read to him.

11. HOMICIDE—SELF-DEFENSE—INSTRUCTION.—An instruction that for a plea of self-defense to be availing, that it must have appeared to the defendant that his acts were necessary in order to save his own life, or to escape great bodily harm, *held* to be warranted by the testimony.

12. APPEAL AND ERROR—MULTIPLICATION OF INSTRUCTIONS.—Trial courts need not multiply instructions upon the same proposition of law.

13. APPEAL AND ERROR—REREADING TESTIMONY TO JURY.—Where a portion of the testimony is reread to the jury by the stenographer at their request, in the presence of the court and the parties, it is not error for the court not to require that all the testimony upon the point be also reread to the jury.

14. HOMICIDE—FIRST DEGREE MURDER—FORM OF VERDICT.—In a prosecution for homicide, the following verdict held proper: "We, the jury, find the defendant guilty of murder in the first degree, as charged in the indictment. A. G. Steadman, Foreman."

Appeal from Jackson Circuit Court; *Dene H. Coleman,* Judge; affirmed.

*S. D. Campbell* and *F. R. Suits,* for appellant; *K. C. Spence,* of Bloomfield, Mo., of counsel.

1.   Any errors, however slight or harmless perhaps, under different circumstances, were prejudicial in this case.  80 Ark. 454; 89 *Id.* 556; 91 *Id.* 555; 105 *Id.* 205. Incompetent testimony was admitted.  Elsie Beacham testified that she pointed out Mims to Sanderson as the person who handed Kelley the gun.  This was a subsequent event and no part of the *res gestae.*  66 Ark. 264; 69 *Id.* 558; 73 *Id.* 152; 78 *Id.* 381; 82 *Id.* 58; 85 *Id.* 300; 88 *Id.* 451, 579; 100 *Id.* 269; 105 *Id.* 247; 123 *Id.* 101.

2.   Dr. O. E. Jones' testimony as to a bullet going "wild," etc., was incompetent.  55 Ark. 593; 62 *Id.* 74, 496; 66 *Id.* 110.

3.   It was error to admit Seligman's testimony as to what he heard.  The person was not identified; it was indefinite and no foundation was laid.

4.   Forest Abernathy's testimony as to what he heard defendant say to some woman was too remote, indefinite and uncertain.  82 Ark. 58; 83 *Id.* 268; 123 *Id.* 109.

5.   Gallagher's testimony and the transcript of Mrs. Hays' shorthand notes was incompetent and prejudicial. No foundation was laid.  84 Ark. 178; 63 *Id.* 130; 91 *Id.* 491.  Defendant had no counsel present and no opportunity to cross-examine.  60 Ark. 402.

6.   No foundation was laid for Herman Richard's testimony.

7.   The prosecuting attorney was allowed to ask defendant questions as to former offenses.  53 Ark. 392, etc.

8.   Ben Sanderson's testimony as to the knife was not competent, and the court erred in its statement that Mabel Sherman had identified the knife.  No foundation was laid for this testimony and the court's statement was prejudicial.

9. The court erred in excluding competent testimony.

10. It was error to give instruction No. 17. Also in refusing defendants No. 3. Also in allowing the stenographer to read notes as to the testimony of Forest Abernathy.

11. There was error in receiving the verdict of the jury in the form it was, and the verdict is not supported by the evidence nor does it support a death sentence. They should have fixed the punishment at death or life imprisonment. Act 187, Acts 1915; 57 Ark. 560; 113 Fed. 991; 117 Am. St. 737; 176 S. W. 980; 53 Miss. 428.

12. Incompetent hearsay evidence was admitted. 78 Ark. 77, and others.

*John D. Arbuckle,* Attorney General, and *T. W. Campbell,* Assistant, for appellee.

1. Elsie Beacham's testimony was neither incompetent nor prejudicial. The facts were otherwise proven. 58 Ark. 374; 76 *Id.* 276; 84 *Id.* 16; 88 *Id.* 135; 91 *Id.* 576; 96 *Id.* 582; 103 *Id.* 314; 100 *Id.* 149; 79 *Id.* 453.

2. Dr. Jones' testimony competent. 25 Ark. 380; 14 *Id.* 438; 48 *Id.* 177.

3. David Seligman's testimony was competent. 177 S. W. 917.

4. There was no error in admitting Forest Abernathy's testimony. 130 Ark. 101.

5. Gallagher's testimony as transcribed by Mrs. Hays was properly admitted. The proper foundation was laid. 90 Ark. 514; 29 *Id.* 17; 58 *Id.* 353; 33 *Id.* 539; 60 *Id.* 400. Nor was the testimony prejudicial. 58 Ark. 374; 73 *Id.* 407; 76 *Id.* 276; 66 *Id.* 264; 77 *Id.* 453; 84 *Id.* 16; 88 *Id.* 135; 103 *Id.* 87.

6. The transcript of testimony of Herman Richards was properly admitted. 74 Ark. 72; 83 *Id.* 223; 80 *Id.* 65.

7. It was not prejudicial error to permit the prosecuting attorney to ask as to other offenses. 100 Ark. 304; 53 *Id.* 387; 55 Ark. Law Rep. 576.

8. No error committed in admitting Ben Sanderson's testimony in rebuttal. It was competent.

9. No error in excluding testimony. The questions were improper. The matters were fully developed elsewhere.

10. Instruction No. 17 was not error. 88 Ark. 447; 95 Id. 409.

11. There was no error in refusing No. 3, as No. 2 was given. 103 Ark. 352; 104 *Id.* 417.

12. The verdict was in proper form and death sentence properly imposed. Acts 1915, 774. The jury had the option to fix the punishment at life imprisonment, but did not, and the court properly sentenced him to death under the law. The jury were properly instructed as to the punishment, and they elected not to be lenient.

HUMPHREYS, J. Appellant, Chess Kelley, was indicted, tried and convicted of murder in the first degree, for killing H. A. Harmon, between 1 and 2 o'clock A. M., June 9, 1917, at Elsie Beacham's home in the red light district in Newport, Arkansas. From the judgment and sentence of death an appeal has been lodged in this court.

The substance of the State's evidence leading up to and immediately surrounding the killing was as follows: Appellant went in company with Zeph Mims and Mabel Sherman to the home of Elsie Beacham, with whom he was infatuated, between 1 and 2 o'clock A. M., on June 9, 1917. The house contained three rooms in a row. The door to the front room was fastened with a button and had a chair against it. The middle door or door to the bedroom was closed. A rocking chair with Elsie Beacham's dress on it was near the bed. A light burning low was on a dresser at the foot of the bed. Harmon's clothes were in a drawer to the dresser and his knife, keys, etc., were in the pockets. H. A. Harmon, an automobile mechanic, and Elsie Beacham were sleeping together in the bed. The front door was forced open and Chess Kelley, followed by Zeph Mims and Mabel Sherman, opened the middle door and entered the bedroom. Kelley said to

Mims, "Hand me the gun, I am going to kill the son-of-a-bitch." Mims handed Kelley the gun. Harmon was sitting on the side of the bed but got up and they (Kelley and Harmon) went together and were scuffling close to the bed. Harmon was unarmed. Kelley fired five shots. Four shots took effect and one ranged up and went through the wall above Elsie Beacham's head. Four balls entered Harmon's body in front and two of the wounds were powder-burned, the other two not. There were three exit wounds. Immediately after the shooting Harmon fell across the bed. Kelley threw the empty shells on the floor and said he had bought the gun for $22 to kill the son-of-a-bitch, Elsie Beacham and himself. A physician was called, who administered to Harmon but he died at 8 o'clock A. M. from the gunshot wounds.

The substance of appellant's evidence leading up to and immediately surrounding the killing was as follows: Appellant had known Elsie Beacham, Mabel Sherman and Zeph Mims for several weeks. He had been intimate with Elsie Beacham but was not jealous of her. He returned from Missouri, where he had been on a visit, on the evening before the tragedy occurred. After supper he spent the evening on the streets, in a billiard hall and at the restaurant. During the evening he had let Lawrence have his pistol and after getting it back from him to take home he left the restaurant in company with Mims, who had accepted an invitation to spend the night with him. They got to appellant's room about 12 o'clock but decided to go down and get appellant's laundry from Mabel Sherman before going to bed. They found her sitting up with a sick child, and, after talking about an hour, went with her to see if Elsie Beacham would rent her a room. Elsie had recently rented the house. Appellant had his pistol in his bosom but did not know H. A. Harmon was bedding with Elsie and did not go there to kill him. When they got to Elsie's house appellant knocked three times on the door and called Elsie, and knocked again, and either Elsie or Harmon said, "Come in, the door is open." Appellant entered with Mims and Mabel Sherman. He knocked

at the middle door, pushed it open and all entered in the middle room. Elsie and Harmon were sitting on the bed. Harmon said, "What does this mean?" Appellant said, "Not a thing, Buddy." Elsie said, "That is that G—d d—d long, slim son-of-a-bitch man I used to have; get up and kill him." Harmon said, "Beat it or I'll kill you." Harmon grabbed a knife out of the chair and started toward appellant, who jumped away from him and told him to stop, but he didn't. Appellant jumped away from him a second time, shot over his head and told him to stop. Harmon started at him again and appellant shot him. The first shot was fired when Harmon was approaching appellant with a knife. Harmon made three stabs at appellant when he caught Harmon's wrist and Harmon grabbed the gun and four shots were fired while they were scuffling. They fell on the bed together and appellant called to Elsie to take the knife as he did not want to kill Harmon unless he had to. Elsie refused and Mabel took the knife out of Harmon's hand. Appellant testified he believed it was necessary to kill Harmon in order to save himself from great bodily harm or death. He denied making any statement as to why he bought the pistol or concerning his love for Elsie, but said Elsie was crying and threatened to buy a gun and kill him, Mims and herself. After turning Harmon over, at his request, he told Elsie and Mabel to get a doctor and he took his pistol to a woman by the name of Allie, and surrendered to Turbin and Sandmon.

Having stated the case in this general way to bring the opinion within reasonable space, we will now announce our conclusions upon the assignments of error insisted upon by appellant for reversal of the judgment.

(1) Elsie Beacham was permitted to testify over the objection of appellant, that immediately after the killing she pointed out Zeph Mims to the night marshal as the man who handed the gun to Kelley. Elsie Beacham testified that Kelley asked Mims for the gun to kill Harmon and that Mims handed him the gun. If this testimony were true it would tend to show that Kelley had

gone there to kill Harmon. This was positive evidence, and it was either true or not true. The fact that she later pointed out Mims to the night marshal as the man who handed Kelley the gun could not add weight to her positive evidence. It was not a question of identity of Mims, so that pointing him out would tend to corroborate her identification. The question was whether Kelley asked Mims for the gun to kill Harmon and received it from him for that purpose. If the evidence were incompetent as not being a part of the *res gestae,* it was non-prejudicial, and, therefore, harmless error to admit it.

(2) Over the objection and exception of appellant, Dr. O. E. Jones was permitted to testify "that one of the bullets had gone wild evidently. It was six or seven feet above the floor. Just opposite this house—the houses were five or six feet apart—there was a hole where it had gone through into this other house, and the fellow next door brought me one of these bullets." Elsie Beacham testified that one of the balls struck the wall above her head. Appellant testified that he fired the first shot high to try to stop Harmon. It is contended that Jones' statement that one of the bullets went wild indicated that Kelley tried to kill Harmon the first shot but failed on account of poor marksmanship. Doctor Jones did not see the killing, so it is obvious he was not attempting to show the intent of Kelley in firing the shot or to say which shot went wild. It was clearly an expression on his part to indicate that one ball ranged higher than the others in an attempt to describe the situation as he found it after arriving at the scene of the tragedy.

No special reason why the balance of Doctor Jones' statement was incompetent or prejudicial has been pointed out by able counsel for appellant, and we are unable to discern any. The evidence disclosed that all the bullets fired were 41's in size and that one bullet passed out through the wall into the adjoining house. It was competent for Doctor Jones to testify to the physical conditions as he found them, and also competent for him to

testify that the next door neighbor brought him one of the bullets.

(3)   It is insisted that the court erred in admitting the testimony of Dave Seligman to the effect that during an interval between the last two shots he heard some man in the room say, ''Elsie, I love you better than anybody else in the world.   I bought this a short while ago just for this purpose; I intended to kill him and then kill you, and then kill myself.''   Appellant was not identified as the author of the statement but it was used either by him or some one in his presence during the occurrence and was admissible as a part of the *res gestae.*

(4)   It is insisted the court erred in admitting the testimony of Forest Abernathy to the effect that he heard appellant about eight hours before the killing threaten to kill a certain automobile mechanic if he stayed with Elsie.   Harmon, the man killed, was an automobile mechanic and was found by appellant immediately before he killed him in bed with Elsie Beacham.   The threat was quite definite and sufficiently connected in point of time with the transaction to render it admissible as a circumstance tending to show appellant's intent in, or probable motive for killing Harmon.   *Cranford* v. *State,* 130 Ark. 101.

(5-6)   It is insisted the court erred in permitting Judge Otis W. Scarborough to read to the jury the transcribed evidence of H. C. Galligher taken by Mrs. Hays, the stenographer, at the inquest held by the coroner over the body of the deceased for the reasons—

*First.*   Because sufficient foundation was not laid to introduce the testimony of an absent witness.

*Second.*   Because the evidence was identified and read by the deputy prosecuting attorney and not the stenographer.

*Third.*   Because the inquest held before Coroner Nolan where H. A. Gallagher testified was not a judicial proceeding.

1st. A subpoena was issued for H. C. Gallagher three weeks before the trial. The sheriff ascertained by inquiring at his usual working place that he had gone to Louisiana. S. C. Wilkerson testified that Gallagher had gone to Louisiana and that he had received a letter from him written and mailed at Jeffries, La. The absence of the witness from the State was sufficiently established to justify the introduction of his evidence given before the coroner.

2nd. The witness testified under oath, and the testimony was taken in shorthand by a stenographer employed for the purpose and by her transcribed. The transcribed evidence was read to the jury by the deputy prosecuting attorney, who testified that he was familiar with the testimony given by the witness before the coroner and that the testimony read corresponded with his recollection thereof. There is no law requiring the evidence to be identified by the stenographer. The identification of the evidence by one who can recall the substance of the evidence is sufficient to justify its introduction.

3rd. It was generally known and appellant admitted that Harmon was killed by gunshot wounds inflicted by appellant, so the only purpose for a coroner's inquest was to ascertain whether the killing was unlawful. The deputy prosecuting attorney was present for the purpose of conducting the examination. There was a substantial compliance with every requirement of the rule adopted by this court for the admission of the evidence of an absent witness.

1. The witness testified under the sanction of an oath.

2. Appellant was under arrest, present and given an opportunity to cross-examine the witness. While no formal charge had been preferred against him, he was for all practical purposes a defendant in the proceedings.

3. The proceeding was judicial in nature.

4. The testimony in detail was reduced to writing under direction of the coroner.

5. A subpoena had been issued for the witness and the sheriff had ascertained from those who knew him best that he was absent from the State. *McNamara* v. *State,* 60 Ark. 402.

It is insisted that the court erred in admitting the evidence of Herman Richards tending to identify the knife claimed to have been used by Harmon in the affray as the knife of Mabel Sherman. The question and answer, embracing the evidence to which specific objection was made, are as follows:

"Q. Is the knife in the same condition in which it was when you cleaned your finger nails with it?

"A. In the same condition it was on the 18th day of May. It belonged to Mabel Sherman, I suppose. I started to go off with the knife and she said, 'Where is my knife?'"

(7) Appellant contended that Harmon attacked him with a knife he had picked up in a chair in Elsie Beacham's house in the room where the difficulty occurred, and was attempting to stab him with it when he (appellant) shot Harmon. Mabel Sherman turned the knife over to the town marshal, Sandmon, claiming it was the knife used by Harmon in an attack on appellant. Sandmon turned the knife over to the coroner. Elsie Beacham testified that Harmon did not attack appellant with a knife. Whether the particular knife in question was used by Harmon in an attack upon appellant became an acute issue in the case. Any evidence tending to show that the knife was the property of Mabel Sherman would tend to show that Harmon did not use it in an attack upon appellant. We think Richards' evidence tended to show that Mabel Sherman was the owner of the knife and in that way tended to disprove the claim of appellant that Harmon attacked him with it. Appellant objected to the whole of Richards' evidence because the transcribed notes of his testimony taken by the stenographer at the inquest were identified and read to the jury by the deputy prosecuting attorney. The witness was absent from the State

and the evidence was admissible under the rule announced in *McNamara* v. *State, supra.*

(8) It is insisted that the court erred in permitting the prosecuting attorney on cross-examination of appellant to draw out the fact that he had been convicted of a felony in Missouri. The specific objection was made that the record would be the best evidence. This court held in *Younger* v. *State,* 100 Ark. 321, that it is permissible, in order to test the credibility of a defendant who takes the witness stand in his own behalf, to ask him on cross-examination whether he has been convicted of a crime or served a term in the penitentiary. Under this rule, it was not error to ask appellant, on cross-examination, touching his former record for the purpose of testing his credibility.

(9) It is insisted that the court erred in permitting Ben Sandmon to testify in rebuttal that the knife introduced in evidence was the same knife introduced in evidence at the coroner's inquest and that the court aggravated the error by stating, "Mabel Sherman identified the knife, and she is one of defendant's witnesses." The undisputed evidence showed it was the same knife, and the remark of the court called attention to that fact. The fact being undisputed, no prejudice resulted to appellant by additional evidence showing it to be the same knife nor by the remarks of the court that defendant's witness identified the knife.

But it is said Sandmon's testimony, relating to a conversation with Mabel Sherman after the killing, was erroneously admitted. Mabel Sherman was a witness for appellant and denied telling Sandmon that she was not there at the time of the shooting; and denied telling him that she did not know how the trouble started. The subsequent conversation between Mabel Sherman and Sandmon, detailed by him and objected to by appellant, consisted of statements made by Mabel Sherman contradictory of her testimony in the case. The evidence was admissible for the purpose of impeaching the witness.

It is insisted the court erred in excluding as immaterial the cross-question propounded to Dave Seligman as to which side of the bed he slept on the night of the difficulty. Seligman and his wife were sleeping in the house next to Elsie Beacham's and heard pistol shots and some one talking in the room when the shooting occurred. He testified that he heard the shots and certain statements made by a man in the room. As he testified to things he heard it seems to us wholly immaterial as to which side of the bed he slept on. There was no showing that he could not have heard that to which he testified had he slept behind instead of before, or *vice versa*.

(10) It is also insisted that the court erred in excluding as immaterial the following question: "Did they summons you over the telephone or did they read the subpoena to you?" It is said this question was proper to ascertain the interest or bias of the witness. If the witness came in response to a summons over the telephone it would not tend to show bias or prejudice, so we think the court was correct in excluding the evidence.

It is contended the court erred in refusing to permit appellant to prove by Mabel Sherman that Kelley did say he had bought the gun for $22 for the purpose of killing Harmon, Elsie and himself. Mabel Sherman testified, in substance, that no such statement was made by Kelley. She said: "While I was in there Kelley did not make any statements about killing Elsie and Harmon. Kelley didn't cry that night after the killing, and didn't hear him make any statements to Elsie as to his feelings toward her." This testimony fully corroborated appellant's on the point, and no prejudice resulted to him on account of the court's action in refusing a repetition of her testimony in relation thereto.

It is insisted that the court erred in refusing to permit Kelley to testify in rebuttal "that he had never heard from any source and did not care, whether Elsie Beacham had Harmon as her man." It seems that Kelley was permitted to answer as to what he knew, for he testified on the point as follows: "I did not know that Har-

mon was bedding with Elsie, made no statement to anybody at that time or place, that I objected to him doing that, and never kept her at any time or place as my woman.'' He was also permitted to testify that he had seen her bedding with other men and that he made no objection to it. The testimony given by him amounted to an expression on his part that he was not jealous of Elsie, so no prejudice resulted to him by the exclusion of the particular question on the point objected to by the State.

(11) It is insisted that the court erred in giving instruction No. 17, which is as follows:

''If you find from the evidence that the defendant, Kelley, was the aggressor in the difficulty and brought about the fatal encounter, then he can not avail himself of the justification of self-defense until he has shown that he made an effort to retire from the conflict, and exercised all reasonable means within his power, consistent with his safety, as the circumstances appeared to him, to avert the danger and avoid the apparent necessity of the killing; and that the killing was necessary to prevent his losing his own life, or receiving great bodily harm at the hands of the deceased.''

It is said the instruction was not warranted because there was not sufficient testimony that Kelley was the aggressor. Elsie Beacham testified that Kelley initiated the fight and continued to be the aggressor throughout the difficulty. Her evidence on the point was sufficient warrant for the instruction. It is said the instruction was erroneous because it tended to prevent the jury from giving the defendant the benefit of the reasonable doubt as to lower grades of homicide. The instruction must be read and considered in connection with other instructions given and the objection suggested to this instruction is eliminated by the giving of other instructions covering the questions of reasonable doubt and the lower grades of homicide.

It is said the instruction is erroneous for the reason that it did not correctly or fully include the circumstances

under which it was not appellant's duty to retire from the conflict. The latter part of the instruction covers the idea that appellant was not required to retire from the conflict if by so doing he would subject himself to great bodily harm or endanger his life. It is clearly indicated in the latter part of the instruction that it was not incumbent upon appellant to retire if Harmon was making a deadly assault upon him with a knife.

(12) It is insisted that the court committed reversible error in refusing to give instruction No. 3, asked by appellant, which is as follows: ''A reasonable doubt may arise where there is lack of evidence to satisfy your minds and consciences as to the defendant's alleged guilt.''

It is not required that trial courts multiply instructions upon the same proposition of law applicable to the case. Instruction No. 2, given by the court, is in substance the same as instruction No. 3, requested by appellant. It is as follows:

''By reasonable doubt is meant that the evidence of the defendant's guilt must be clear and convincing and fully satisfy your minds and consciences; but it does not mean a mere imaginary, possible or captious doubt.''

The point made by learned counsel for appellant is that appellant was entitled to an affirmative declaration of the law on the point. It appears to us that instruction No. 2, given by the court, is an affirmative declaration of the law, as much so as instruction No. 3, requested by appellant. The court did not err in refusing instruction No. 3, requested by appellant.

(13) Appellant insists that the court erred in permitting the stenographer to read Forest Abernathy's evidence to the jury in response to the jury's request after the case had been submitted. It appears that the evidence was read to the jury in the presence of the court and parties. The chief objection urged is that appellant's evidence on the same point should have also been read to the jury at the same time. No such request was made, either by appellant or the jury. It would be an

impractical and burdensome rule that necessitated the reading of all the evidence in a record bearing upon a particular point, or the reading of all the witnesses testifying about the same transaction, upon the request of a jury to hear the evidence of some particular witness read. We do not think the court committed error in permitting the stenographer to read the evidence of Abernathy to the jury.

It is insisted that the court erred in receiving the verdict of the jury in form as returned, and in discharging the jury; and in rendering a judgment for murder in the first degree on the verdict. The form of the verdict was as follows: "We, the jury, find the defendant guilty of murder in the first degree, as charged in the indictment. A. G. Steadman, Foreman."

A verdict in this form was approved by this court in the case of *Gilchrist* v. *State,* 100 Ark. 330. In the Gilchrist case the jury first returned a verdict without fixing the degree of murder and leaving the punishment to the court. At the time the verdict was rendered in the Gilchrist case the jury had no discretion with reference to the punishment. It was the duty of the jury to specifically designate the crime and the law fixed the punishment. In order to clear the verdict from the cloud, the verdict was amended so as to insert the degree of homicide and strike out the recommendation that the court fix the punishment. Since the verdict in the Gilchrist case was rendered, the law has been amended so as to permit juries in capital cases to impose the penalty of life imprisonment in lieu of the death penalty. Section 1 of the act is as follows:

"That the jury shall have the right in all cases where the punishment is now death by law, to render a verdict of life imprisonment in the State penitentiary at hard labor." Act 187, Acts 1915.

(14) It is strenuously insisted by learned counsel for appellant that the act is mandatory and imposes a duty upon the jury to fix the punishment either of death or life imprisonment. We think the plain language of the

statute is against the contention. It, in so many words, extends a privilege or right to a jury to impose a lighter punishment than death.  In case the clemency is not extended, the punishment fixed by law follows the verdict. We agree with counsel that a verdict of doubtful meaning as to what penalty was intended should be corrected. In the instant case no cloud is apparent in the verdict. Neither will the facts warrant the inference that the jury intended to reduce the penalty to life imprisonment for they were told that they had the privilege to do so under the law and were specifically instructed as to the form of the verdict in case they desired to reduce the penalty.  They rejected the form of verdict extending clemency and returned a verdict finding the appellant guilty of murder in the first degree.  We have examined the case of *Avant* v. *State,* 117 Am. St. Rep. 737 (88 Miss. 226), but the verdict in that case clearly indicated that the jury did not want the death penalty imposed.  The verdict in that case was as follows:  "We, the jury, find the defendant guilty as charged and beg the mercy of the court."  The language employed did not reflect the "actual intent and finding of the jury," so it was the duty of the court in the Avant case to require the jury to dispel the cloud.  There was no cloud in the verdict in the instant case to dispel.  The language conveying the intent of the jury was unambiguous.

No error appearing in the record, the judgment is affirmed.