EDDIE (TATE) MORRIS *v.* STATE OF ARKANSAS

5508                                    462 S. W. 2d 842

Opinion delivered February 8, 1971

*Walker, Kaplan, Lavey & Mays,* for appellant.

*Joe Purcell,* Attorney General; *Mike Wilson,* Asst. Atty. Gen., for appellee.

CONLEY BYRD, Justice. Appellant Eddie (Tate) Morris appeals from a sentence of seven to twenty-one years on a robbery conviction.

During some racial troubles in Forrest City on August 14, 1969, about 9:00 p.m. two Negroes, George Tabor and Jerry Porter, went to Thompson's Grocery Store to buy bread. As they were about to enter the store they found William F. Epps, the store's only employee at that time of day, standing in the entrance bleeding profusely from stab wounds. They ascertained that Epps was unable to call for help and when they saw

the cash register open with only three pennies in it, they used their own money to call Thompson's home and the police. Sergeant E. J. Frames of the Forrest City Police was the first officer to arrive at the scene. From information furnished by Epps, Sergeant Frames notified the police radio network that Thompson's Store had been robbed and Mr. Epps stabbed in the robbery. Sergeant Frames described the robbers as two tall Negro males wearing dark clothes—one having a bushy head and the other a goatee.

In another part of Forrest City, Robert Lee Patterson, a Negro, was driving his car when he spotted his friend Sylvester Robinson. After some conversation Patterson agreed to drive Robinson to Memphis. At this point Robinson and his friends got into Patterson's car and drove to Robinson's abode at Janet Moore's house so that Robinson could get three dollars to buy gasoline for the trip. About the time Robinson reentered Patterson's car, the appellant, Eddie Tate, as he was then known, Johnny Harper and Peggy (Tate) Smith ran out of Janet Moore's house, pulled Robinson's friends out of Patterson's car and upon entering themselves commanded Patterson to "Drive, man, drive." When Patterson asked what was up, he was told by Peggy (Tate) Smith, "Best you don't know." Either Harper or appellant told Patterson that they would tell him once they got out of St. Francis County. When Patterson found out some of the details, he did not appreciate his situation. He did something to his car to cause the gas gauge to show that he was about out of gasoline. He convinced his passengers that he should stop at Palestine to get some gas. At the gas station he blinked his lights and did a few other things to attract the attendant's attention but the attendant did not notice. The gasoline was paid for by a five dollar bill that Peggy (Tate) Smith got from under her dress. The intruders then decided that they wanted to go to Memphis by way of Interstate No. 40. Between Palestine and Forrest City, Patterson observed an unmarked State Police car driven by Sergeant William Mitchell. To attract Mitchell's attention, Patterson drove at the State Police car and then weaved down the road as if he were drunk.

Mitchell had heard Sergeant Frames' network broadcast of the robbery and stabbing and also the description of the alleged robbers. As a result of Patterson's driving, Mitchell stopped Patterson to investigate him for drunk driving. At this point there is a variance between Patterson's version of what was said and that of Mitchell. Mitchell says that when Patterson got out of his car, Patterson said, "Officer, I'm glad you stopped me. The people in my car have just robbed and killed a man in Forrest City." Mitchell says that Patterson also told him that the occupants of the car had threatened Patterson, saying, "One more son-of-a-b. . . . wouldn't make any difference."

Patterson's version, on cross-examination, was that he told Officer Mitchell, "I made that dive in the road in order for you to stop me because there's some mens in the car I want you to get out, because something is wrong and I don't know what it is." When the Officer asked him if the people in the car were the ones involved in the robbery, Patterson testified that he said: "What store? I don't know nothing about a store." In other parts of his testimony Patterson stated that he did tell Officer Mitchell about the threat that the occupants had killed one S. B. and one more wouldn't make any difference.

As a result of Patterson's statements and the descriptions given by Sergeant Frames, Officer Mitchell placed Patterson and all the occupants of the car under arrest. The men and the car were searched at the scene by Officer Mitchell. A grocery sack containing some change was found on the back seat. Back at the station a policewoman searched Peggy (Tate) Smith and found $59.00 in paper money between her underclothes and her body.—According to the cash register tapes approximately $177.00 was taken in the robbery.

Appellant contends that the record shows that Negroes and poor people were systematically excluded from the jury. We do not agree. The record shows that of the panels from which the jurors who tried appellant were selected, 25% of the regular panel and 39% of the alternate panel were Negroes. The income of the jurors

who tried appellant ranged from $3,600 to $12,300 per year. Other figures in the record and attached to the record show that there were 33,303 inhabitants in St. Francis County according to the 1960 census and that about the time of the trial there were as many as 6,287 people on welfare. According to the 1960 census 56.7% of the population were Negroes. A deputy clerk estimated that 46% of the qualified electorate were Negroes. While the proportion of Negroes to other races on the jury can be so disproportionately small as to cast the burden on the State to show that no discrimination was involved, we do not find the record here to be so out of line as to shift the burden to the State. This is particularly so when we consider that a jury must be picked so as not to discriminate against, not only race, but also religion, social status and employment. Finally jurors must be selected who can comprehend the ordinary vocabulary used in the court room and who are able to retain, organize and make a logical deduction from the evidence heard in the court room. Otherwise verdicts would become illogical and based more on sentiment or persuasiveness of counsel than the facts. A number of people remain on the lower end of the economic scale because of their inability to separate facts from their sentiments, then to correlate them and to make a logical deduction therefrom.

Appellant alleges that his arrest was without probable cause and thus the trial court should have granted his motion to suppress the evidence obtained in the search of Patterson's car, the search of Peggy (Tate) Smith and State's Exhibit No. 1, a picture taken of appellant on October 8, 1969. We agree with the trial court that Officer Mitchell had probable cause to arrest appellant.

It is also argued that the trial court erred in denying appellant's motion to pay his attorney's fees, in refusing to permit his attorney to withdraw as his counsel and in refusing appellant's motion to discharge John T. Lavey as his counsel. The record here shows that before the robbery appellant had been arrested and charged with spitting on the sidewalk at the local sheriff. His present counsel, John T. Lavey, was apparently furnished to him in that proceeding by a

"Committee for Peaceful Coexistence" headed up by a Reverend Cooley. Patterson testified that after they were placed in jail a person named Goodloe, a law student working in Lavey's office, talked to them about letting a member of Lavey's firm represent them and that was agreed to. The record further shows that when appellant filed his motion to proceed in forma pauperis and for the payment of Lavey's fee, the trial court explained that payment of fees by the state was not allowed when the defendant retained or selected counsel but that if Mr. Lavey wished to withdraw, the court would appoint competent counsel for appellant at the expense of the state. When Mr. Lavey refused to withdraw as counsel for appellant, the trial court denied the application for counsel fees. After a number of motions were filed and overruled by the trial court, Lavey then filed a motion to withdraw as counsel for appellant because of an alleged conflict between the parties he was representing. This motion was overruled. Some few days before the trial and while hearing motions filed by Lavey, Patterson notified the court that he did not want Lavey for his counsel. At that time Lavey was permitted to withdraw as Patterson's counsel. Finally on the day of trial appellant moved to discharge Lavey as his counsel. This motion was denied.

We can find no error of the trial court in refusing to pay counsel employed or retained by the defendant upon a forma pauperis petition—particularly under the record here made. Neither do we find any merit in the alleged error of the trial court in refusing to permit Lavey to withdraw as counsel and in refusing to discharge Lavey as counsel upon defendant's motion. Under the record the trial court could properly have concluded that Lavey's motion was not in good faith and that appellant's motion was nothing more than a ruse for a continuance.

Appellant complains that the trial court erred in evicting him from the court room during the trial and in commenting to the jury about it. On this issue it is shown that after the jury was selected and appellant had told a deputy sheriff that "He was going to pull a Bobby Seales," he created a commotion in the court room by

kicking over a chair and talking to the court in some rather loud language. Thereafter the court in chambers explained to appellant that he had to abide by the ordinary rules of conduct and decency if he wished to remain in the court room during his trial. Upon appellant's refusal to abide by the rules, the court instructed the sheriff to return appellant to jail. Returning to the court room, the judge explained to the jury that they should not consider appellant's conduct and remarks as going to the issue of guilt because his actions and his language were not evidence of guilt. The judge also explained that the trial would proceed in the absence of appellant because appellant had informed the court that he would not abide by the rules of court.

The court did not err in removing appellant from the court room. See *Illinois* v. *Allen,* 397 U. S. 337, 25 L. Ed. 2d 353, 90 S. Ct. 1057 (1970). Furthermore we can find no error in the trial court's comment to the jurors since they were entitled to some explanation under the circumstances.

The contention that appellant's guilt and punishment should not have been simultaneously submitted to the jury is contrary to the authorities generally. See *Bagley* v. *State,* 247 Ark. 113, 444 S. W. 2d 567 and *Maxwell* v. *Bishop,* (8 Cir. 1968) 398 F. 2d 138.

State's Exhibit No. 2 was a knife found just outside the door from which the robbers fled. It is true that the knife was not connected to appellant, but Epps' testimony indicates that it fits the description of one of the knives used. Even if we should conclude that it should not have been introduced because of its immateriality, still the record here demonstrates that its introduction was harmless since the only real issue in the case was one of identity.

Under our law, the prosecution, upon apprehension of appellant as one of the alleged robbers, had the option of (1) taking him before a magistrate where upon a showing of probable cause he would be bound over to the grand jury, or (2) filing an information directly in circuit court. The prosecution elected to do the latter

and appellant now complains that it deprived him of any pretrial discovery. Without conceding that the argument otherwise has merit, we point out that appellant is not in a position to complain because the prosecution furnished him with the names of all witnesses and permitted his counsel to inspect all statements in the prosecutor's file, including the statements of appellant.

Appellant also moved to strike all of the testimony of witness Epps as to how he identified appellant from State's Exhibit No. 1. The record shows that one key to appellant's identity was a goatee. At trial appellant had shaved off the goatee and when Epps was testifying appellant was not in the court room. Thus it became necessary for the State to connect up the evidence concerning the goatee which it did by State's Exhibit No. 1, a photograph of appellant taken on October 8, 1969. The evidence shows that a deputy sheriff at one time showed Epps some thirty photographs from which Epps picked State's Exhibit No. 1 as being a picture of one of his assailants. The same procedure reoccurred later when the deputy prosecuting attorney handed Epps some thirty photographs from which Epps again selected appellant. After State's Exhibit No. 1 had been introduced appellant was brought into the court room and Epps again and in unmistakable terms identified appellant as one of the robbers. On cross-examination counsel for appellant moved for production of the other pictures shown to Epps which the court overruled after the court learned that the officers no longer had all the pictures used. The court room identification of appellant by Epps without the aid of the picture is so convincing that, like the court in *Simmons* v. *United States,* 390 U. S. 377, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968), we are unable to say that the trial court abused its discretion in overruling the motion to produce the other pictures. But also, like the court in the *Simmons* case, we admonish officers everywhere that the better practice would be to make and keep a list of the photographs used in such situations.

Affirmed.